## No. 13,794.

### MONROE ET AL. *v.* MONROE.

(63. P. [2d] 459)

Decided December 7, 1936. Rehearing denied December 28, 1936.

Mr. T. E. MUNSON, Mr. JOHN P. BECK, for plaintiffs in error.

Messrs. McCONLEY & McCONLEY, for defendant in error.

*En Banc.*

MR. JUSTICE YOUNG delivered the opinion of the court.

CHARLES Archer Monroe, plaintiff in the district court, had a judgment canceling a deed from his father, James

Monroe, since deceased, to Duncan D. Monroe, Nettie M. Hains, J. Harry Monroe, Nellie V. Shannon and Frank Monroe, defendants, who were children of said deceased and brothers and sisters of plaintiff. The deed was canceled on the ground that there had been no delivery by James Monroe prior to his death. Reference will be made to the parties as plaintiff and defendants as they appeared in the district court, or by name.

James Monroe died intestate and the plaintiff and defendants were all of his heirs at law. The assignments of error concededly raise but one question, namely, whether there is evidence to support the court's finding that the deed was not delivered. If there is evidence to support such finding the judgment must stand; if not, it must be reversed.

The trial judge saw the witnesses and heard their testimony and under our rule, too well established to require citation of authorities, we must construe the evidence, if it reasonably may be so construed, to support the court's finding and judgment.

The presented evidence was substantially as follows: James Monroe was a farmer, operating in Logan county, who had accumulated property of an inventoried value of approximately $80,000. He had given to his children, other than Harry and Duncan, a quarter section of dry land each, except the plaintiff Charles Archer, to whom he had given 360 acres of land. All of the children except Harry were indebted to him in varying sums, Duncan to the amount of $6,000 and Nellie V. Shannon in an amount sufficient to consume her entire interest in his estate. The plaintiff's indebtedness to him appears to have been but $1,000. All of the children except Harry were married. Harry had remained at home and, beginning with 1912, had rented from his father the 176 acres conveyed by the questioned deed, and known as the Home Place, continuously to the time of his father's death, November 3, 1933. It appears from the evidence that prior to the father's death, Harry had arranged with him to

rent the place for the year 1934, which arrangement was continued with the administrator of his father's estate, and carried on to completion.

July 10, 1933, James Monroe, the father, was stricken with paralysis and confined to a hospital for a month, at the expiration of which time, having partially recovered, he went to the rooming house of a Mrs. Westlake in Sterling where he resided until his death, November 3, 1933. For ten years preceding his death he had rented in his name a large safety deposit box at the Security State Bank in Sterling. Harry Monroe had a key and the box was used jointly with his father during all that time. At the suggestion of Mrs. Archer Monroe, and on the day that James Monroe was stricken with paralysis, Harry took his personal effects, including his key to the deposit box which he retained until his father's death, with the exception of one occasion either September 29th or October 20th—there being a conflict in the testimony as to the date—but at any rate at a time when Mrs. Archer Monroe drove her father-in-law out to Harry's place to get the key to examine his box, because it had been suggested to him by someone that Harry was stealing his money out of it. It was on the occasion of this examination that it is contended delivery of the deed in question was made. When James Monroe went to his safety deposit box he procured a large envelope; took it to his room at Mrs. Westlake's and examined its contents. The record justifies the conclusion that the envelope contained $2,020 in money, a $500 liberty bond, two certificates of deposit aggregating $4,000, an abstract of title, some water stock, a quitclaim deed to the home place, which appears as an exhibit in the case and purports to have been executed on January 22, 1931. When James Monroe completed his examination of these papers it was after banking hours. He had Mrs. Westlake call Harry to his room and reliance is placed on what there took place as accomplishing a delivery of the deed. The record contains the account of this transaction as given by

Harry Monroe, Mrs. Westlake and by R. L. Sauter, the attorney for the administrator, who related his conversation with Harry Monroe. The account of the transaction given by Harry is as follows: "Q. Now, Mr. Monroe, you state in your answer that on September 29, 1933, your father delivered you this quitclaim deed to the property in question. Please state where and under what circumstances he gave you this deed. A. He gave me this deed along with some other papers down at Mrs. Westlake's. He had gotten this package out of the bank box and had looked it over, and called me in and he says, 'Harry, everything is all right, my money is all there,' and he says, 'There's some papers inside for you. Take them home and take care of them.' "

Again he repeats it as follows: "A. He says, 'Harry,' he says, 'I have found everything all right, and there's some papers inside for you. Take these and take it home and take care of it,' and just as we were coming out of the door of the bedroom he says, 'Hold on, I forgot, here's my bank box key. Take it along with you too,' and he handed me the key to the bank box. That was September 29, 1933."

The testimony of Mrs. Westlake as to what took place is as follows: "Well, he and Harry had some conversation in the room there and when he came out of his bedroom into the dining room, he said 'Everything is all right, take these papers home and take care of them. Everything is all right.' Then he said, 'Hold on,' and he put his hand in his vest pocket and he took out the key and he says, 'Here's my key. Take that home and take care of it.' "

The testimony of another witness concerning the conversation with Harry as set out in the abstract of record is as follows: "That after his father had examined the contents of the box or envelope 'his father told him something to the effect, I have found everything all right' and delivered back either the package or the box, and said something to him, substantially what Harry Monroe has

testified to here, with this exception that, as I recall it, he did not tell him to take this home, he told him to take it back, and he explained to us he took it home because it was late in the afternoon, and the bank had closed. He stated to us his father told him to take it, and then he said everything was all right, to 'take it back,' and there was an additional statement that I am not exactly sure of the conversation that led up to it. It seemed to me, as I recall it, it was prefaced by some remark such as, 'If anything happens,' or 'at the proper time,' but I would not say for sure that that was said, but anyhow he said, 'There is something in there for you,' * * * I do not recall the exact language. He stated that Harry said he did not know at the time this package was delivered to him what the papers were his father referred to.''

Harry Monroe testified that he did not know what was in the envelope when his father gave it to him until he reached home and examined it with his sister, Nettie M. Hains. That he then took the deed and consulted Mr. Roberts of the Platte Valley Title and Trust Company, who had drawn it, as to whether he should record it and was told by him that the deed was good whether recorded before or after his father's death, and that if he recorded it then it would look as if he were in a hurry and that for that reason it would be best not to record it. Harry then placed it with his own papers in his father's box from which place he recovered it November 6th, the day after his father was buried, without the knowledge of any of the other heirs except Duncan Monroe and recorded it on the same day before any of them examined the box. Mr. Roberts testified as to Harry's having a conversation with him concerning the deed, but fixed the time as after the death of James Monroe instead of before as testified by Harry.

Counsel for defendants call our attention to section 1, chapter 150, page 587, Session Laws, 1927, which makes the recording of a duly acknowledged conveyance prima facie evidence of due delivery. Obviously the trial court

thought the evidence conflicting and found that the statutory presumption had been overcome. We think there was evidence from which reasonable men might draw different conclusions.

The court no doubt considered that the motive that prompted deceased to examine his safety deposit box was to ascertain if Harry had been taking his money; that when he found it all there his faith in Harry, if once shaken, was restored and that he turned over to Harry the envelope containing the cash, certificates of deposit, a bearer bond and the deed, abstract and water stock to be replaced with his papers in the bank. Harry testified that he said: "Take these home and take care of them, there are some papers in there for you." Mrs. Westlake heard the conversation, but as she recalled it, the instruction given was to take the papers home and take care of them, followed by giving Harry his key. In view of the fact that Harry had access to the bank and could return the deed to the box where it had reposed undelivered among the papers of deceased for over two years the instructions as detailed by Mrs. Westlake were reasonably susceptible of the interpretation that Harry was merely to return the papers to the box from which they had been taken by his father. This is the more reasonable because no specific mention was made of the deed. The testimony of an attorney for the administrator, interested only in ascertaining the relation of the administrator to the property, is to the effect that Harry did not tell him, when questioned as to what occurred, that he was told to take the papers home, but that he was told to take them back, and that he took them home only because it was too late to return them to the bank. The court in his observations called attention to the fact that though five children were named as grantees in the deed, the father, according to Harry's version of the conversation, did not mention the other four but merely said, "there are some papers in there for you," referring to Harry. While not definite, the testimony of the attorney

for the administrator as to the conversation with the deceased as reported to him by Harry, justifies the inference that if anything was said about the papers belonging to Harry it was prefaced by the condition, "If anything happens to me," or "at the proper time." These are not words necessarily importing an intention to make delivery presently vesting title to real estate.

 We think the testimony clearly presented an issue of fact which the court, who heard the witnesses, resolved in favor of plaintiff. Under our well-established rule we are bound by fact findings of the trial court based on conflicting evidence, which are supported by the record.

We have been favored with the citation of many authorities by counsel for both parties. The cited cases present many different fact situations where the question of delivery was in issue. No purpose could be served by reviewing all of them as the facts in none of them are identical with those in the case at bar. We shall refer briefly to the two Colorado cases cited by defendants. *Walker v. Green,* 23 Colo. App. 154, 128 Pac. 155, relied on by defendants, is a case involving conflicting evidence in which the judgment of the trial court properly was affirmed. That other trial courts have drawn different conclusions from similar facts does not indicate that there was not evidence to support a contrary conclusion, even in that case, had the issue been so resolved by the trial court. Certainly such cases cannot determine the question of the existence or nonexistence of a conflict in the evidence in this case, which is the sole issue before us. The case of *McGowan v. Lockwood,* 65 Colo. 264, 176 Pac. 298, was one in which this court held there was no conflict in the evidence as to the facts relied upon as constituting a delivery. Delivery then became a question of law for the court. Under this situation, entirely different from the instant case, where there is conflicting evidence, this court reversed the judgment of the trial court.

For the reasons hereinabove set forth, the judgment is affirmed.

MR. JUSTICE BURKE sitting for MR. CHIEF JUSTICE CAMPBELL, who did not participate.

MR. JUSTICE HOLLAND dissents.